IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

September 2020 Term

**FILED**
**November 10, 2020**
released at 3:00 p.m.
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

No. 19-0527

BISON INTERESTS, LLC,
Defendant Below, Petitioner

v.

ANTERO RESOURCES CORPORATION and
CGAS PROPERTIES, L. P.,
Plaintiff and Defendant Below, Respondents

Appeal from the Circuit Court of Harrison County, West Virginia
The Honorable Thomas A. Bedell, Judge
Civil Action No. 18-C-271-2

REVERSED

Submitted: October 27, 2020
Filed: November 10, 2020

Frank E. Simmerman, Jr., Esq.
Chad L. Taylor, Esq.
Frank E. Simmerman, III, Esq.
Simmerman Law Office, PLLC
Clarksburg, West Virginia
Attorneys for Petitioner

W. Henry Lawrence, Esq.
Ancil G. Ramey, Esq.
Justin A. Rubenstein, Esq.
Shaina L. Richardson, Esq.
Steptoe & Johnson PLLC
Bridgeport, West Virginia
Attorneys for Respondent Antero
Resources Corporation

JUSTICE WORKMAN delivered the Opinion of the Court.
CHIEF JUSTICE ARMSTEAD, deeming himself disqualified, did not participate in the decision of this case.
JUDGE H. CHARLES CARL, III, sitting by temporary assignment.

SYLLABUS BY THE COURT

1.      "A circuit court's entry of summary judgment is reviewed *de novo*."

Syl. Pt. 1, *Painter v. Peavy*, 192 W.Va. 189, 451 S.E.2d 755 (1994).


2.      "'"'An adjudication by a court having jurisdiction of the subject-matter

and the parties is final and conclusive, not only as to the matters actually determined, but

as to every other matter which the parties might have litigated as incident thereto and

coming within the legitimate purview of the subject-matter of the action.  It is not essential

that the matter should have been formally put in issue in a former suit, but it is sufficient

that the status of the suit was such that the parties might have had the matter disposed of

on its merits.  An erroneous ruling of the court will not prevent the matter from being res

judicata." Point 1, Syllabus, *Sayre's Adm'r v. Harpold*, 33 W.Va. 553 [11 S.E. 16].'

Syllabus Point 1, *In re Estate of McIntosh*, 144 W.Va. 583, 109 S.E.2d 153 (1959)."  Syl.

Pt. 1, *Conley v. Spillers*, 171 W. Va. 584, 301 S.E.2d 216 (1983).


3.      "Before the prosecution of a lawsuit may be barred on the basis of res

judicata, three elements must be satisfied.  First, there must have been a final adjudication

on the merits in the prior action by a court having jurisdiction of the proceedings.  Second,

the two actions must involve either the same parties or persons in privity with those same

parties.  Third, the cause of action identified for resolution in the subsequent proceeding

either must be identical to the cause of action determined in the prior action or must be

such that it could have been resolved, had it been presented, in the prior action." Syl. Pt. 4, *Blake v. Charleston Area Med. Ctr., Inc.*, 201 W. Va. 469, 498 S.E.2d 41 (1997).

4. "Judicial estoppel bars a party from re-litigating an issue when: (1) the party assumed a position on the issue that is clearly inconsistent with a position taken in a previous case, or with a position taken earlier in the same case; (2) the positions were taken in proceedings involving the same adverse party; (3) the party taking the inconsistent positions received some benefit from his/her original position; and (4) the original position misled the adverse party so that allowing the estoped party to change his/her position would injuriously affect the adverse party and the integrity of the judicial process." Syl. Pt. 2, *W. Va. Dep't of Transp., Div. of Highways v. Robertson*, 217 W. Va. 497, 618 S.E.2d 506 (2005).

WORKMAN, Justice:

This is an appeal from the May 8, 2019, order of the Circuit Court of Harrison County granting summary judgment in favor of respondent Antero Resources Corporation ("Antero") in its action against petitioner Bison Interests, L.L.C. ("Bison") and CGAS Properties, L. P. ("CGAS"),[1] declaring that Bison is not entitled to an overriding royalty interest in the Marcellus shale formation underlying certain gas wells. The circuit court found that the issue of Bison's entitlement to an overriding royalty in the Marcellus shale production had not been finally adjudicated in prior litigation and therefore Antero's action was neither barred by res judicata or collateral estoppel, nor was Antero judicially estopped from advancing its claim. Accordingly, the circuit court granted declaratory relief to Antero, finding that "Turnkey Drilling Agreements" were incorporated by reference into certain warranty deeds of assignment, which agreements created a depth limitation to Bison's interests. Therefore, it declared that Bison had no entitlement to an overriding royalty interest in the Marcellus shale production underlying the subject leaseholds.

Upon careful review of the briefs, the appendix record, the arguments of the parties, and the applicable legal authority, we conclude that the declaratory judgment sought by Antero in this matter is barred by the doctrines of res judicata and judicial estoppel. We therefore reverse the circuit court's award of summary judgment to Antero

---

[1] CGAS, defendant below, was dismissed from the action and makes no appearance in this appeal.

1

and its declaration finding Bison is entitled to no overriding royalty interest within or underlying the 900-foot radii of the Clark and Ash well boreholes.

## I. FACTS AND PROCEDURAL HISTORY

In 2012, Bison assigned Antero its interest in certain leaseholds including the subject Clark and Ash leases at issue herein. According to Antero, Bison retained the "wellbore interests" and an overriding royalty interest (or "override").[2] In March of 2015, Bison sued Antero for failure to pay the overriding royalty interest, alleging breach of contract, breach of fiduciary duty, unjust enrichment, and seeking an accounting and declaratory relief regarding the "rights and obligations" with respect to the leases (the "2015 litigation"). Antero filed a counterclaim, seeking interpleader relief, asserting that CGAS may have an interest in the overriding royalties and therefore it could not determine to whom the overriding royalty was owed. In its counterclaim, Antero took no position that Bison's interest was otherwise limited and stated that "Antero has no interest in the ownership of the overriding royalty interest." Approximately one year after the action was first filed, Bison amended its complaint to also challenge the manner in which Antero was calculating the overriding royalty, alleging that it was engaged in a hedging scheme upon

---

[2] An "overriding royalty interest" is "a fractional interest in the gross production of oil and gas, in addition to the usual royalties paid to the lessor. . . . An overriding royalty interest is generally carved out of, and constitutes a part of, the working interest created by an oil and gas lease." *Covenants for overriding royalties in oil and gas lease assignments*, Nancy Saint-Paul, 3 <u>Summers Oil and Gas</u> § 29:13 (3d ed. 2019).

which the royalties should have been calculated, but was instead paying royalties on the lesser production price, resulting in an underpayment of royalties.[3]

CGAS intervened in the 2015 litigation and reached an agreement with Bison wherein each company disclaimed a competing overriding royalty interest in certain leasehold acreage. CGAS agreed it had no right to overriding royalty payments in the Marcellus formation underlying a 900-foot radius of the specific Clark and Ash wells and Bison agreed it had no right to overriding royalty payments for gas produced outside of the 900-foot radii. Upon that agreement, the parties signed agreed consent orders resulting in CGAS' dismissal from the case in August, 2016 (regarding the Clark Lease) and May, 2017 (regarding the Ash Lease) (the "CGAS/Bison Agreed Orders"), respectively.

During discovery in August, 2017, Bison moved to compel a title report from Antero pertaining to the Ash lease acreage; in opposing its production, counsel for Antero made certain statements which Bison contends was an acknowledgment that Bison is entitled to an overriding royalty interest in the Marcellus shale. In particular, Antero's written response to the motion stated that the title documents "involve issues already resolved in this litigation by entry of the [CGAS/Bison Agreed Orders]" and are "irrelevant to the remaining claims in this litigation." It stated further that the title documents "go to the point of ownership of the Ash Lease acreage, which was already settled by [the

---

[3] In response to the amended complaint, in April 2016, Antero answered and reasserted its counterclaim, again stating that it had "no interest in the ownership of the overriding royalty interest."

3

CGAS/Bison Agreed Orders].” Further, Antero's counsel stated at oral argument on the motion that “[t]he issue that was presented originally . . . was the . . . borehole assignment, who owns the Marcellus at the bottom of the borehole? . . . *The parties now agree that Bison owns the entire hole*[.]” (emphasis added). The motion to compel was denied.

Also during the discovery phase of the 2015 litigation, Antero claims that it first received the “Turnkey Drilling Agreements” (the “Agreements”) which were referenced in certain warranty deeds of assignment involving the subject leases. It maintains that only upon receiving the Agreements did it become aware of purported depth limitations which it now claims limit Bison's overriding royalty interests to the shallower Benson Sands and not the Marcellus shale. The Agreements were not recorded and Antero contends that it was provided merely a “sample” of such agreements during its due diligence, which sample did not contain the purported depth-limiting language. At trial, Bison's managing member admitted that he did not previously provide the Agreements to Antero, but that Antero did not press the issue before consummating the transaction.

The parties proceeded to trial on the breach of contract, breach of fiduciary duty, and constructive fraud claims. The court reserved the declaratory judgment aspect

4

of the 2015 litigation until after trial.[4]  The jury found in favor of Bison on the breach of contract claim and awarded damages of $55,375.63 against Antero.[5]

Post-trial, Bison filed a motion to resolve its declaratory judgment claim "concerning the 'hedge' pricing issue.'"  Antero also filed a motion for declaratory judgment, apparently asking the court to determine whether Bison was entitled to overriding royalties for production from the Marcellus shale underlying the 900-foot radii of the Clark and Ash wells—the same declaration it seeks in the instant action.[6]  Judge Christopher J. McCarthy, who presided over the 2015 litigation, entered an order (the "McCarthy order") ruling on the hedge pricing issue advanced by Bison, but declining to resolve the Bison overriding royalty issue requested by Antero.  The order states:

> Antero also urges this Court to interpret the terms of the agreements between Bison and CGAS Properties, L.P., and their respective predecessors in interest, *to determine Bison's entitlement to royalties on Marcellus Shale production by Antero from the Ash and Clark Leases.*  Third parties to a contract between two private citizens generally cannot sue to obtain a declaration as to validity of such a contract or to raise questions as to its construction.  See § 55-13-2, but see Shobe v. Latimer, 1979, 253 S.E.2d 54, 162 W. Va. 799.  Further, in

---

[4] The circumstances under which this determination was made and which specific declaratory judgment issues were being held in abeyance is not clear from the appendix record.

[5] The verdict form finds only that Antero breached its contract and makes an award of damages; the jury rejected allegations of constructive fraud and breach of fiduciary duty. Claims for unjust enrichment and an accounting were abandoned before trial.

[6] Neither motion for declaratory relief nor the responses thereto are contained in the appendix record.

the instant case, one of the parties, CGAS Properties, L.P., whose entitlement under the agreements would be directly affected, is no longer a party to this case and, thus, would not have the opportunity to be heard on the issue. *The Court, therefore declines to address this issue in the instant action*.

(emphasis added). With respect to Bison's motion, the circuit court determined that the overriding royalty was to be determined based on the "hedge pricing ultimately realized by Antero." Neither this order, nor the jury verdict, was appealed.

Contemporaneous with the 2015 litigation, Bison (and/or related companies) was involved in federal litigation with Antero regarding rights of first refusal pertaining to the subject leases. Bison asserts that in those federal proceedings, and subsequent to the trial of the 2015 litigation, Antero made statements to the effect that the 2015 litigation culminated in an understanding and/or determination that Bison was entitled to an overriding royalty interest in the Marcellus production. Bison notes Antero's statements in various filings that "the jury [in the 2015 litigation] accepted [Bison's] . . . position that it is entitled to an overriding royalty interest by virtue of the Assignment . . . of Marcellus rights to Antero as part of its disposition of the breach of contract claim" and that "[Bison] represented and the Court in the State Court Action accepted that [Bison] has an overriding royalty interest in Antero's production on the Subject Leases, which allowed [Bison] to recover damages from Antero based on a breach of contract claim[.]" Antero was represented by the same counsel in the federal proceedings as the case at bar.

6

Approximately six months after entry of the McCarthy order, in November 2018, Antero filed the instant litigation seeking a declaratory judgment as to the ostensibly unanswered question from the 2015 litigation: whether Bison is entitled to an overriding royalty interest in the Marcellus shale production underlying the Clark and Ash well boreholes. Antero moved for summary judgment, arguing that the Agreements were incorporated by reference into the warranty deeds of assignment and contained depth-limiting language, thereby limiting Bison's overriding royalty interest to the shallower Benson Sands. In response, Bison moved to dismiss and/or for summary judgment, contending that this issue had already been resolved or conceded in the 2015 litigation and was therefore barred by res judicata, collateral estoppel, and/or judicial estoppel.

The circuit court denied Bison's motion, finding no res judicata or estoppel, and granted Antero's motion, concluding that the Agreements demonstrate that Bison's royalty interest is depth-limited and therefore it is not entitled to an overriding royalty interest from the Marcellus shale production underlying the Clark and Ash leaseholds.

More specifically, with respect to Bison's motion, the circuit court found that the CGAS/Bison Agreed Orders did not resolve or purport to resolve the issue of whether Bison was entitled to a royalty in the Marcellus shale; rather, the orders simply evidenced that neither party claimed a "competing interest to the other's claimed acreage." It further found that the jury's verdict in the 2015 litigation established only that there was a breach of contract for which damages were appropriate, but that "no further attribution, breakdown

7

or explanation [was] . . . requested by the parties," implying that the verdict did not demonstrably establish Bison's entitlement to the overriding royalty. Finally, the circuit court found that because the McCarthy order expressly declined to rule on the Marcellus overriding royalty issue, that issue was preserved and could be pursued in a separate action. The court rejected the argument that statements made by counsel had conceded resolution of the issue and therefore found no judicial estoppel.

As to Antero's motion for summary judgment on its request for declaratory relief, the court determined that the warranty deeds of assignment as to the Clark and Ash leases incorporated the Agreements by reference and were therefore "depth limited by the unambiguous (i.e.; plain) language . . . [in the] Turnkey Drilling Agreements[.]"[7] This appeal followed.[8]

---

[7] In particular, the court cited similar language in both Agreements providing that "developer shall be entitled to be assigned and shall be assigned not less than 81.25% of all oil and gas reserves in place, *to a depth through the Benson Sand Horizons*, on the subject acreage and produced by any well drilled on such location or site." (emphasis added).

[8] Bison sought relief from the circuit court's order pursuant to West Virginia Rule of Civil Procedure 60(b), submitting additional excerpts from the trial seeking to establish that Antero had conceded that it claimed no ownership interest in the overriding royalty. Antero countered with additional trial excerpts seeking to demonstrate that the testimony was taken out of context and did not concede the issue, but rather reiterated the uncertainty concerning Bison's entitlement to the override. As of the time of the briefing in this matter, the motion was apparently still pending.

## II. STANDARD OF REVIEW

As is well-established, "[a] circuit court's entry of summary judgment is reviewed *de novo*." Syl. Pt. 1, *Painter v. Peavy*, 192 W.Va. 189, 451 S.E.2d 755 (1994).

## III. DISCUSSION

Bison contends that the instant suit is barred by the doctrines of res judicata, collateral estoppel,[9] and/or judicial estoppel. In support, it claims 1) the jury in the 2015

---

[9] While the focus of our discussion is on the applicability of res judicata and judicial estoppel, Bison also argues that the instant case is barred by collateral estoppel. Collateral estoppel is distinguishable from res judicata in that collateral estoppel bars litigation of matters which have *actually* been litigated, whereas res judicata may apply to matters that *could have* been litigated. We have summarized the distinction as follows:

> "But where the causes of action are not the same, the parties being identical or in privity, the [collateral estoppel] bar extends to only those matters which were *actually litigated in the former proceeding, as distinguished from those matters that might or could have been litigated therein,* and arises by way of estoppel rather than by way of strict *res adjudicata.*" *Lane v. Williams*, 150 W.Va. 96, 100, 144 S.E.2d 234, 236 (1965).

Syl. Pt. 2, *Conley v. Spillers*, 171 W. Va. 584, 301 S.E.2d 216 (1983) (emphasis added).

Bison contends that the issue of its entitlement to the Marcellus shale overriding royalties was necessarily decided by the jury, as a prerequisite to its award of damages in the 2015 litigation. However, Antero's pretrial memorandum—the lone pretrial memorandum contained in the appendix from that litigation—identifies the issues to be tried as centering exclusively around the alleged underpayment of royalties based on production, i.e. the "hedging issue." In its briefing below, Antero suggests that the verdict "could" constitute royalties for "other leases" under the assignment, the interest on withheld payments, or the alleged failure to file reports, rather than overriding royalties. In its brief before this Court it states merely that the jury determined that Antero "owed [Bison] overriding royalties *in general*." (emphasis added). Neither party provides any
(continued . . .)

litigation must have determined Bison was entitled to overriding royalties from the Marcellus shale to award it damages for breach of contract; and 2) statements made by Antero's counsel during and following the 2015 litigation concede that the issue was resolved in the 2015 litigation, or, at a minimum, estops it from now taking a contrary position that the issue is no longer settled.

Antero counters that the McCarthy order makes clear that the court in the 2015 litigation refused to decide the issue and therefore it was not finally adjudicated. As to its allegedly inconsistent positions, Antero claims that it only became aware of the alleged depth limitation in the Agreements and Bison's resultant lack of entitlement to overriding royalties after it received the Agreements in discovery and only then did it change its position to claim that Bison was not entitled to an override from the Marcellus production.

---

portion of the transcript from the 2015 litigation which would more definitively establish what the jury was asked to resolve or what its verdict was based upon. However, from those limited portions which do appear in the appendix, it is clear that testimony about whether Bison was entitled to royalties from the Marcellus shale production because of the purported depth limitation in the Agreements was made part of the trial to some extent.

We find that the record before this Court is insufficient to conclude that the issue of Bison's entitlement to overriding royalty interests in the Marcellus production was necessarily presented to or determined by the jury in the 2015 litigation. This inadequacy precludes a determination of whether Antero is collaterally estopped from proceeding in the instant action, but is not fatal to Bison's appeal. As more fully discussed *infra*, our analysis of whether the issue *could have* been determined in the 2015 litigation, giving rise to res judicata, is dispositive.

A.    RES JUDICATA

Because of the McCarthy order's declination of the issue, the circuit court below found that the question of Bison's entitlement to the overriding royalty interest in the Marcellus production underlying the Clark and Ash leases "received no final adjudication on the merits in [the 2015 litigation]" and therefore the 2015 litigation had "no preclusive effect[.]"  Bison asserts this conclusion was error and that the matter was either conceded or adjudicated, as evidenced by statements of counsel during the proceedings or the jury's award of damages, respectively.

1.    *RES JUDICATA AS TO MATTERS WHICH "COULD HAVE BEEN" DETERMINED*

Res judicata seeks to avoid parties being "'twice vexed for one and the same cause.'"  *Conley*, 171 W. Va. at 588, 301 S.E.2d at 219 (quoting *State ex rel. Connellsville By-Product Coal Co. v. Continental Coal Co.*, 117 W. Va. 447, 449, 186 S.E. 119, 120 (1936)).  "*Res judicata*, or its modern term, claim preclusion, prohibits 'splitting' a claim or cause of action. Claims that could have been raised by a prevailing party in the first action are merged into, and are thus barred by, the first judgment." *Chesterfield Vill., Inc. v. City of Chesterfield*, 64 S.W.3d 315, 318 (Mo. 2002) (en banc) (citation omitted).

Pertinent to the instant appeal, it is well-established that res judicata applies not only to matters *actually litigated*, but to matters which *could have been* litigated. Precluding litigants from bringing subsequent claims that could have been brought in the

11

first action, "'protects their adversaries from the expense and vexation attending multiple lawsuits, conserves judicial resources, and fosters reliance on judicial action by minimizing the possibility of inconsistent decisions.'" *Conley*, 171 W. Va. at 588, 301 S.E.2d at 219-20 (quoting *Montana v. U. S.*, 440 U.S. 147, 153-54 (1979) (footnote omitted)). In that regard, this Court has held:

> "'An adjudication by a court having jurisdiction of the subject-matter and the parties is final and conclusive, not only as to the matters actually determined, but *as to every other matter which the parties might have litigated as incident thereto and coming within the legitimate purview of the subject-matter of the action*. It is not essential that the matter should have been formally put in issue in a former suit, but *it is sufficient that* the *status* of the suit was such that *the parties might have had the matter disposed of on its merits*. An erroneous ruling of the court will not prevent the matter from being *res judicata*.' Point 1, Syllabus, *Sayre's Adm'r v. Harpold*, 33 W.Va. 553 [11 S.E. 16]." Syllabus Point 1, *In re Estate of McIntosh*, 144 W.Va. 583, 109 S.E.2d 153 (1959).

Syl. Pt. 1, *Conley*, 171 W. Va. 584, 301 S.E.2d 216 (second emphasis added).

In 1997, this Court succinctly reiterated that "*res judicata* may operate to bar a subsequent proceeding even if the precise cause of action involved was not actually litigated in the former proceeding *so long as the claim could have been raised and determined*." *Blake v. Charleston Area Med. Ctr., Inc.*, 201 W. Va. 469, 477, 498 S.E.2d 41, 49 (1997) (emphasis added). We established a three-factor test for determining whether a matter is barred by res judicata:

> First, there must have been a final adjudication on the merits in the prior action by a court having jurisdiction of the proceedings. Second, the two actions must involve either the

same parties or persons in privity with those same parties. Third, the cause of action identified for resolution in the subsequent proceeding either must be identical to the cause of action determined in the prior action or *must be such that it could have been resolved,* had it been presented, *in the prior action*.

Syl. Pt. 4, in part, *Blake*. (Emphasis added).

Antero readily concedes elements two and three: that the same parties are involved and "that the claim here is *identical* to a claim in the Prior Litigation." (emphasis added). It also concedes that "it had a full and fair opportunity to litigate the issue in the [2015] Litigation." Ostensibly, then, it challenges only the first element: a "final adjudication" on the merits. While Antero concedes the 2015 *litigation* resulted in a final adjudication on the merits, it argues that the specific overriding royalty ownership issue asserted herein obtained no such final adjudication, as a result of the McCarthy order's refusal to rule on it.

However, Antero misunderstands the "prior final adjudication" element set forth in *Blake*. The requirement of a prior "final adjudication" pertains to the prior *action*— not the specific claim allegedly barred by res judicata. Otherwise, matters that were not raised, yet "could have been resolved" would never give rise to res judicata. The question presented is whether there was a prior action which received a final adjudication on the merits, in which action the specific claim was or could have been presented. As explained above, claims that could have been resolved but were not, are "merged into, and are thus barred by, the first judgment." *Chesterfield Vill., Inc.,* 64 S.W.3d at 318. There is no

13

question the 2015 litigation resulted in a final adjudication on the merits, as it culminated in a judgment order and final, unappealed order declining to award declaratory relief to Antero on the issue presented.

Rather than the "final adjudication" element, Antero's argument strikes more at the "could have been resolved" application of res judicata. In effect, Antero argues that not only "could" it have raised the issue—it did, but the court refused to rule on it. It therefore implicitly takes the position that the McCarthy order's declination of the issue absolved it of the requirement to obtain resolution of the issue within the confines of the 2015 litigation.[10] Antero offers no reasoning for its failure to appeal the McCarthy order,

---

[10] Antero's singular focus on the circuit court's refusal to decide the issue leads it to cite one case in support of its position that, as a result of this refusal, the ownership issue survived the 2015 litigation and may properly be brought in a separate action. It argues that Syllabus point two of *Nickey v. Grittner*, 171 W. Va. 35, 297 S.E.2d 441 (1982), provides support for a litigant's ability to assert in a new action, that which was expressly unresolved in a prior action:

> "An issue held to be not properly before the court and left expressly undetermined, may be raised in further proceedings between the parties." Syl. pt. 3, *West Virginia Sanitary Engineering Corp. v. Kurish*, 137 W.Va. 856, 74 S.E.2d 596 (1953), *quoting*, Syl. pt. 6, *New River & Pocahontas Consolidated Coal Company v. Eary*, 115 W.Va. 46, 174 S.E. 573 (1934).

Importantly, however, in the prior action involved in *Nickey*, the court determined that it did not have jurisdiction to resolve the issue presented and in that regard the issue was "not properly before the court." *Id*. It is well-established that lack of subject matter jurisdiction over a claim presented in a prior action will not give rise to res judicata. *See* W. Va. R. Civ. P. 41(b) (stating that involuntary dismissals for "lack of jurisdiction" do not operate as adjudications upon the merits); 18A Cooper, Edward H., "On the Merits"— (continued . . .)

14

stating summarily during oral argument that an appeal was "not necessary" and that "instead of taking an appeal," it filed the instant action.[11]  A closer review of the McCarthy order is therefore appropriate.

### 2.      THE MCCARTHY ORDER

As indicated above, the McCarthy order articulates two bases for the court's "declination" to resolve the issue:  1) the proposition that third parties cannot obtain declaratory relief regarding the "construction" of a contract, citing the operative declaratory judgment statute and *Shobe v. Latimer*, 162 W. Va. 799, 253 S.E.2d 54 (1979); and 2) CGAS's absence from the 2015 litigation, which interests would be "directly affected" by ruling on ownership.  The Uniform Declaratory Judgments Act, West Virginia Code §§ 55-13-1 to 16 (1941), provides, in part:

> *Any person interested* under a *deed*, will, written *contract*, or other writings constituting a contract, *or whose rights*, status *or other legal relations are affected* by a statute, municipal ordinance, *contract* or franchise, may have determined any question  of  construction  or  validity  arising  under  the

Lack or Refusal to Exercise Jurisdiction, Fed. Prac. & Proc. Juris. § 4436 (3d ed. 2020) ("The basic rule that dismissal for lack of subject-matter jurisdiction does not preclude a second action on the same claim is well settled.").

[11] In this regard, *Blake* encourages courts to "evaluate the claims raised by the plaintiff in the subsequent proceeding and scrutinize the plaintiff's reasons as to why he/she was unable to earlier discover the nature of his/her claim during the course of the prior action[.]" 201 W. Va. at 477-78, 498 S.E.2d at 49-50.  As discussed herein, Antero's belief that appeal of the McCarthy was "unnecessary" and it could simply file a new action was ill-informed.  Furthermore, its long-standing awareness of questions regarding Bison's entitlement to an overriding royalty because of the purported depth limitation—while seemingly litigating to jury verdict its entitlement to damages for those very royalties— smacks of the type of unnecessary and circuitous litigation res judicata prohibits.

> instrument, statute, ordinance, contract or franchise and obtain a declaration of rights, status or other legal relations thereunder.

*Id*. § 55-13-2 (emphasis added). The plain language of the declaratory judgment statute, therefore, suggests that Antero was properly entitled to seek resolution of whether Bison held an overriding royalty interest in the Marcellus shale production pursuant to the various conveyances in its chain of title—just as it has requested in the instant action. Further, the case cited in the McCarthy order—*Shobe v. Latimer*—expresses precisely this rule. *Shobe* holds that anyone whose affected interests qualifies under the language of West Virginia Code § 55-13-2 may bring a declaratory judgment action and "it is not essential that a party have a personal legal right or interest" for such standing. Syl. Pt. 2, *Shobe*, 162 W. Va 779, 253 S.E.2d 54. Despite the McCarthy order's suggestion to the contrary, Antero was not an "unrelated, intermeddling third-part[y] seeking to enforce a private contract having no impact on [its] interests." *Id*. at 786, 253 S.E.2d at 59. Therefore, the McCarthy order's implication that Antero was not entitled to seek a declaratory judgment on this issue is not well-taken.

The McCarthy order's second basis—that CGAS' interests would be affected by an ownership determination—appears equally groundless. As described hereinabove, CGAS had previously disclaimed any royalty interest in the Marcellus shale production at issue, which was memorialized in the CGAS/Bison Agreed Orders. In fact, this is precisely the position it advanced upon being made a party to the instant litigation and which resulted in its dismissal by the circuit court below.

16

The foregoing notwithstanding, it is not for this Court to speculate on whether Antero would have been successful in any appeal of the McCarthy order. *See Reed v. Allen*, 286 U.S. 191, 198 (1932) ("What the appellate court would or could have done if an appeal from the judgment had been taken and had been heard in advance of the appeal from the decree is idle speculation[.]"). Our discussion demonstrates simply that the order was questionable in its reasoning and that its resultant refusal to resolve an issue which was "fully and fairly litigated," per Antero's own admission, decidedly invited appeal to this Court or, at a minimum, a motion to alter or amend pursuant to West Virginia Rule of Civil Procedure 59(e) or a motion for relief from judgment pursuant to Rule 60(b). Yet Antero did nothing—its failure to in any way challenge the McCarthy court's adverse ruling extinguished its attempt to have the matter resolved and now forecloses a subsequent attempt to relitigate the same matters, as established below.

3. *RES JUDICATA AND THE FAILURE TO APPEAL*

As *Blake* makes clear, res judicata will serve to bar matters which "*could have been* raised and *determined*." 201 W. Va. at 477, 498 S.E.2d at 49 (emphasis added). Had Antero appealed the McCarthy order and error been found in the court's refusal to resolve the issue, the declaratory judgment issue most certainly *could have been*

determined.[12]  The well-established preclusive effect on claims which could have been determined in prior litigation demands that a litigant see a claim through to conclusion, including appeal of an adverse ruling, or suffer the consequences.  *See* Syl. Pt. 2, *State ex rel. Veard v. Miller*, 238 W. Va. 333, 795 S.E.2d 55 (2016) (holding that res judicata bars a subsequent action "when [the prior action] becomes final, either through failure to appeal that judgment or after exhausting appellate proceedings.").[13]

The necessity of appeal of an adverse determination of a matter presented in prior litigation has been well-articulated by the United States Supreme Court in *Angel v. Bullington*, 330 U.S. 183 (1947).  In *Angel*, Bullington's state court action against Angel for a deficiency judgment was dismissed and ultimately found not actionable by the North Carolina Supreme Court.  *Id*. at 185.  Despite the presentation of a federal question regarding the dismissal, Bullington did not appeal the North Carolina Supreme Court's

---

[12] By the same token, had no error been found because of Antero's failure to properly seek declaratory judgment relief, this finding would have likewise "determined" the issue and barred a second bite at the apple.  *See* n.15 *infra*.

[13] *See also Smith v. CSK Auto, Inc*., 132 P.3d 818, 820 (Alaska 2006) ("[T]he failure to appeal a judgment [does not] render that judgment non-final."); *Long Beach Police Officers Ass'n. v. City of Long Beach*, 217 Cal. Rptr. 207, 208 (Cal. Ct. App. 1985) (finding res judicata in subsequent action where party failed to appeal prior judgment and stating "[t]he reasons for the city's nonappeal are immaterial. A party receiving an adverse judgment who allows it to become final is bound by it, whatever his reasons for nonappealing."); *In re Med. Rev. Panel Claim of Scott*, 206 So. 3d 1049, 1059 (La. Ct. App. 2016) (plaintiff's "failure to appeal [prior] judgment bars reconsideration" of issues raised); *Centanni v. Ford Motor Co*., 636 So. 2d 1153, 1155 (La. Ct. App. 1994) (finding failure to appeal prior action did not preclude effect of res judicata).

ruling to the United States Supreme Court. *Id*. He then filed an identical action in federal court. *Id*. The United States Supreme Court found the federal action barred by res judicata, emphasizing Bullington's failure to appeal his adverse ruling to the highest court available for review and the finality created thereby:

> Since it was open for Bullington to come here to seek reversal of the decision of the North Carolina Supreme Court shutting him out of the North Carolina courts and he chose not to do so, the decision of the North Carolina Supreme Court concluded an adjudication of a federal question even though it was not couched in those terms. . . . If a litigant chooses not to continue to assert his rights after a[] [lower] tribunal has decided against him, he has concluded his litigation as effectively as though he had proceeded through the highest tribunal available to him. An adjudication of an issue implies that a man had a chance to win his case. . . . He forewent his right to have a higher court, this Court, enable him to win his chance by holding that he was right and that the North Carolina Supreme Court was wrong. He cannot begin all over again in an action involving the same issues before another forum[.]

*Id*. at 189-90.

Antero appears to suggest that because the McCarthy order did not reach the merits of the ownership issue, its ruling was not necessarily "adverse" to Antero and therefore evades the necessity of appeal and permits a separate action. However, as the United States Supreme Court has explained, "[i]t is a misconception of res judicata to assume that the doctrine does not come into operation if a court has not passed on the 'merits' in the sense of the ultimate substantive issues of a litigation." *Angel*, 330 U.S. at 190. Further, "[a]n adjudication declining to reach such ultimate substantive issues may bar a second attempt to reach them in another court . . . . The 'merits' of a claim are disposed

19

of when they are refused enforcement." *Id*.; *see also Costello v. United States*, 365 U.S. 265, 286 (1961) (finding non-"merits" dismissals such as "failure of the plaintiff to prosecute, or to comply with the Rules of Civil Procedure" invite res judicata because "defendant must incur the inconvenience of preparing to meet the merits because there is no initial bar to the Court's reaching them").

Moreover, the fact that the McCarthy order may have erroneously refused to determine the issue provides no excuse for Antero's failure to obtain a determination in the 2015 litigation. As expressly recognized in Syllabus Point 1 of *Conley*, "[a]n erroneous ruling of the court will not prevent the matter from being *res judicata*." Syl. Pt. 1, 171 W. Va. 584, 301 S.E.2d 216; *see Federated Dep't Stores, Inc. v. Moitie*, 452 U.S. 394, 398 (1981) ("Nor are the res judicata consequences of a final, unappealed judgment . . . altered by the fact that the judgment may have been wrong[.]"); *see also Angel*, 330 U.S. at 187 ("That the adjudication of federal questions by the North Carolina Supreme Court may have been erroneous is immaterial for purposes of res judicata. A higher court was available for an authoritative adjudication of the federal questions involved." (citation omitted)).

By failing to seek review of the McCarthy order's declination of the issue, Antero effectively abandoned its claim for declaratory relief as to Bison's entitlement to the Marcellus override. This Court has previously held that a litigant is not permitted to simply abandon a claim it could have resolved and thereafter evade the effects of res judicata. In *Dan Ryan Builders, Inc. v. Crystal Ridge Dev., Inc.*, 239 W. Va. 549, 561, 803

20

S.E.2d 519, 531 (2017), this Court found that res judicata barred a "new, state court action based upon [an] abandoned federal court claim." Finding that since petitioner "plainly could and should have pursued all of its factually intertwined claims," the Court concluded that its "strategic decision to pursue its claims in a piecemeal fashion" subjected its claims to preclusion. *Id*. at 562, 803 S.E.2d at 532. Emphasizing that petitioner "voluntarily abandoned" its claim in federal court, the Court stated that permitting petitioner to proceed "would impose the unfair and unjust costs and vexation of a second, unnecessary lawsuit" on respondents. *Id*. Because of Antero's election not to appeal the McCarthy order, it effectively abandoned that claim—which it admits was already fully and fairly litigated— and chose instead to try again in a new action. *See Angel*, 330 U.S. at 191 ("He was then content to drop them and let the intermediate adjudication stand. Now he wants an encore.").

Simply stated, "[t]he doctrine of res judicata reflects the refusal of the law to tolerate a multiplicity of litigation." *Franklin Collection Serv., Inc. v. Stewart*, 863 So.2d 925, 929 (Miss. 2003). This statement is particularly germane in view of Antero's well-demonstrated cognizance of questions regarding Bison's entitlement to the override throughout the litigation, as discussed in greater detail *infra*. In fact, trial excerpts contained in the appendix record reveal that Antero's Chief Administrative Officer testified that Antero had filed no amended pleading challenging Bison's ownership interest in the 2015 litigation, despite being "unsure" of Bison's entitlement to the royalties sought and

21

stating that Antero was going to "look at [the issue] here in the future[.]"[14] The officer

further described Antero's intention to file a declaratory judgment action to obtain a "final

decision . . . as to Bison's ownership of the Marcellus":

> [B]asically, we'd file a declaratory action to a court to say
> here's all of the information we have, and we would like you
> to make a decision as to who owns these minerals, because
> quite frankly we're at an impasse as to who has what[.] And
> so . . . we get a declaratory action to who actually owns that set
> of minerals below the borehole in the Marcellus. At that point
> in time, we will continue to pay Mr. Harison and Bison until
> that formal declaration is made.

Even during the throes of trial in the 2015 litigation involving the Clark and Ash wells,

with companion federal litigation pending regarding the wells, Antero was plainly plotting

additional, serial litigation to challenge Bison's entitlement in the first instance to the

overriding royalties to these same wells. As Justice Blackmun observed: "[T]here is a

special need for strict application of res judicata in complex multiple party actions of this

sort so as to discourage 'break-away' litigation." *Federated Dep't Stores, Inc.*, 452 U.S.

at 403 (Blackmun, J., concurring).[15]

---

[14] *See* W. Va. R. Civ. P. 13 (setting forth practice and procedure for compulsory counterclaims).

[15] An additional unstated, but obvious, undercurrent of the McCarthy order's refusal to rule on the motion for declaratory relief filed by Antero is whether Antero ever actually *properly* sought such relief in the 2015 litigation or merely filed a rogue motion seeking to capitalize on Bison's declaratory motion. Notably absent from the parties' recitation of the events in the 2015 litigation and the documents provided in the appendix record is any indication that Antero ever filed a pleading seeking declaratory judgment. Antero filed a counterclaim for interpleader relief, asserting that it could not determine whether Bison or (continued . . .)

In sum, to permit Antero to evade the effects of res judicata by half-heartedly raising the specter of a claim it toyed with throughout the litigation, yet ostensibly never properly plead, serves neither the salutary goals of the doctrine nor the interests of justice. Moreover, permitting Antero to lie dormant in the face of an adverse ruling on the issue after admittedly having an opportunity to fully and fairly litigate it, only to attempt to resurrect the issue anew in a subsequent proceeding, flies directly in the face of the doctrine. Whether the absence of a resolution of the ownership issue in the 2015 litigation is attributable to Antero's failure to appeal the McCarthy order, or its failure to properly make a claim for declaratory relief in the first instance, is of no moment. In either event, Antero failed to secure a determination on the issue when one plainly could have been obtained; indeed, "[t]he predicament in which respondent finds himself is of his own

---

CGAS was entitled to the overriding royalty and refiled that same counterclaim in response to the amended complaint. There is no indication that the counterclaim was ever amended to seek declaratory judgment, despite Antero's admission that receipt of the Agreements (which occurred in the 2015 litigation's infancy, as discussed *infra*) called Bison's entitlement into question and even injected issues about that entitlement into the trial.

Instead, by all appearances, Antero simply attempted to bootstrap the issue to Bison's properly-pled request for declaratory relief as to the hedging issue. A party cannot simply fail to plead a claim for declaratory judgment then file an untethered motion demanding such declaration. *Cf. Zikos v. Clark*, 214 W. Va. 235, 240-41, 588 S.E.2d 400, 405-06 (2003) (disapproving use of motion in long-standing divorce action to seek determination of parties' marital status and noting filing of separate declaratory judgment action the appropriate mechanism). Clearly, any failure on the part of Antero to properly raise the issue for determination in the 2015 litigation would be equally fatal to an attempt to relitigate it in the instant action. A procedural failure on Antero's part to properly raise a matter which could have been determined does not permit a second attempt in a new action.

23

making[.]" *Reed*, 286 U.S. at 198. We therefore conclude that Antero's action for declaratory relief is barred by the doctrine of res judicata.

B.      JUDICIAL ESTOPPEL

The foregoing notwithstanding, the Court finds it appropriate to further consider whether Antero's action is similarly—and independently—barred by the doctrine of judicial estoppel. We undertake this exercise in view of our "prior admonishment that, even though the requirements of *res judicata* may be satisfied, we do 'not rigidly enforce [this doctrine] where to do so would plainly defeat the ends of Justice.'" *Blake*, 201 W. Va. at 478, 498 S.E.2d at 50 (quoting *Gentry v. Farruggia*, 132 W.Va. 809, 811, 53 S.E.2d 741, 742 (1949)). Therefore, an evaluation of whether this "'discretionary equitable doctrine'" equally supports reversal of the circuit court is appropriate. *W. Va. Dep't of Transp., Div. of Highways v. Robertson*, 217 W. Va. 497, 503 n.17, 618 S.E.2d 506, 512 n.17 (2005) (quoting *Whitacre P'ship v. Biosignia, Inc.*, 591 S.E.2d 870, 887 (N. C. 2004)).

Bison contends that because Antero repeatedly insisted both during and subsequent to the 2015 litigation that Bison's entitlement to the override was not in dispute and/or had been resolved by the jury verdict, it cannot now take a contrary position in the instant litigation. Antero claims that it did not alter its position on Bison's entitlement to the override, but if it did, it only did so after Bison produced the Agreements which allegedly demonstrate the depth limitation depriving Bison of such interest. Notably, in its brief, Antero concedes "at the beginning of the [2015 litigation] Antero believed Bison

24

may have been entitled to the entirety of the overriding royalty payments[.]" But, after Bison "finally" produced the Agreements which it "had originally withheld," "[a]t that point, Antero realized that Bison was entitled to fewer royalties than Antero had originally thought and it began asserting the claim at issue here[.]"

> This Court has held:
>
>> Judicial estoppel bars a party from re-litigating an issue when: (1) the party assumed a position on the issue that is clearly inconsistent with a position taken in a previous case, or with a position taken earlier in the same case; (2) the positions were taken in proceedings involving the same adverse party; (3) the party taking the inconsistent positions received some benefit from his/her original position; and (4) the original position misled the adverse party so that allowing the estopped party to change his/her position would injuriously affect the adverse party and the integrity of the judicial process.

Syl. Pt. 2, *Robertson*, 217 W. Va. 497, 618 S.E.2d 506. By virtue of Antero's concession that it previously believed Bison was entitled to the entire override during the early part of the 2015 litigation between these same parties, and its current position that it has no such entitlement, we need not linger long over elements one and two. Antero demonstrably changed its position on Bison's entitlement to the override on the Marcellus production underlying the Clark and Ash wells. The timing and circumstances surrounding that change in position and the consequences, as embodied in elements three and four, predominate our analysis.

We begin with Antero's assertion that it only altered its position on Bison's override entitlement after it received the Agreements, which purportedly contain a depth

25

limitation, limiting Bison's interests to the shallower Benson Sands. Indeed, Antero's brief is replete with thinly-veiled accusations that Bison wrongfully withheld these documents from it and only belatedly produced them. However, these insinuations are demonstrably false: Antero forwarded the Ash turnkey agreement to CGAS by letter dated May 21, 2015, and Bison produced the Clark turnkey agreement in response to discovery requests in July, 2015. Therefore, Antero was in possession of both applicable Agreements no later than four months after the case was first filed in March, 2015.[16]

Nevertheless, approximately *one year after* the Agreements were produced, in April, 2016, Antero continued to state in its counter-claim that it "has no interest in the ownership" of the Marcellus. In August, 2017—over *two years after* the Agreements were produced—Antero's counsel stated: "[W]ho owns the Marcellus at the bottom of the

---

[16] During oral argument, counsel for Antero suggested that the documents which solidified its awareness of Bison's depth limitation were actually certain "schedules" identifying which wells pertained to which Agreements, more so than the Agreements themselves. Counsel suggested there was confusion as to which wells were appended to which Agreement. However, nowhere in Antero's briefing does it make this distinction or mention any such "schedules," representing repeatedly that it was when Bison "finally produced the additional turnkey drilling agreements . . . that Antero determined that Bison was not entitled to overriding royalties for production from the Marcellus Shale formation[.]" Further, because of the piecemeal nature of the testimonial excerpts contained in the appendix, the nature and degree of these alleged errors and/or omissions pertaining to the schedules are in no way discernable by this Court.

Antero also obliquely suggests that its challenge to Bison's entitlement to the override was only fully realized upon Bison's managing member's admission at trial that the depth limitations were "critical." Antero's characterization of the significance of this testimony—in view of what it claims is "unambiguous" depth-limiting language in the Agreements—is overstated, to say the least.

borehole? . . . *The parties now agree that Bison owns the entire hole*[.] . . . This case started out as a dispute as to *who owns the Marcellus in that hole. That dispute's been resolved*." (emphasis added).[17]  In resisting production of title documents with respect to one of the subject leases, Antero represented that the title documents "involve issues already resolved in this litigation" and "go to the point of ownership of the Ash Lease acreage, which was already settled."

Critically, after both the jury verdict in the case and the circuit court's declination of the ownership issue, Antero—represented by the same counsel—made additional statements in federal filings that "the Court in the State Court Action accepted that [Bison] has an overriding royalty interest in Antero's production on the Subject Leases" and "the jury accepted [Bison's] position that it is entitled to an overriding royalty interest by virtue of the Assignment . . . of Marcellus rights to Antero[.]"  It is therefore fairly evident that Antero, despite long having possession of the documents upon which it now relies to extinguish Bison's presumed override interest, continually represented

---

[17] With respect to these statements, Antero attempts to thread a very fine needle.  It argues that these statements pertain strictly to the competing overrides as between CGAS and Bison and the resolution of those competing interests.  Antero insists these statements were not intended to suggest that Antero did not have its own independent challenge to Bison's entitlement and claim to the working interest free and clear of Bison's override, due to the alleged depth limitation.  While we agree that the CGAS/Bison agreed orders do not purport to resolve any issue as between Antero and Bison regarding Bison's override, we believe that these statements intend to convey, at a minimum, that Antero was not challenging Bison's entitlement to the override—a position it has now clearly altered.

throughout and following the 2015 litigation that Bison's ownership interest was simply not a matter of contention or had been resolved by the jury.

Our law also requires that Antero have benefitted from this change of position and that Bison have been misled thereby, such that permitting the change of position "would injuriously affect the adverse party and the integrity of the judicial process." Syl. Pt. 2, *Robertson* 217 W. Va. 497, 618 S.E.2d 506. As to the benefit Antero derived, it successfully avoided production of a title report pertaining to the Ash lease by arguing that the override royalty issue was "resolved." Despite having conceded its "resolution," counsel raised ownership issues at trial as a means of casting doubt on Bison's claim of breach of contract and/or its claim for damages at trial. Furthermore, due to Antero's failure to ever squarely assert or plead the issue in the 2015 litigation, Bison was unaware of the necessity of having the issue resolved; it was therefore deprived of the opportunity to have it resolved in that forum, without having to expend additional time, resources, and money engaging in serial litigation on identical issues.

In sum, we find that the appendix record demonstrates that Antero essentially played "hide the ball" with Bison's overriding royalty entitlement until such time as it suited its needs—conceding that the override was not in dispute to obtain a favorable discovery ruling, then raising the depth-limitation in cross-examination at trial. It then attempted to ride the coattails of Bison's motion for declaratory relief by filing its own motion on the issue, despite apparently never having amended its pleadings to

28

properly seek such relief. It then continued to lie in wait by failing to appeal the McCarthy order, only to file a new action months later and, for the first time, properly plead the issue. Judicial estoppel prohibits precisely such gamesmanship: "'The policies underlying the doctrine include . . . precluding litigants from playing fast and loose with the courts, and prohibiting parties from deliberately changing positions according to the exigencies of the moment.'" *Robertson*, 217 W. Va. at 505 n.19, 618 S.E.2 at 514 n.19 (quoting *United States v. McCaskey*, 9 F.3d 368, 378 (5th Cir.1993)). We therefore conclude that Antero is also judicially estopped from now asserting its claim that Bison is not entitled to an overriding royalty interest in the Marcellus production underlying the 900-foot radii of the Ash and Clark boreholes.

## IV. CONCLUSION

For the foregoing reasons, the May 8, 2019, order of the Circuit Court of Harrison County, West Virginia, is reversed and this case is remanded for entry of an order consistent with this opinion.

Reversed.